[Sac. No. 1609. In Bank.—April 2, 1908.]

In the Matter of the Petition of FRANK B. OGDEN for a review and modification of the opinion rendered in the case of Pekin Mining and Milling Company v. James Kennedy, 81 Cal. 357.

In answer to a petition filed by Frank B. Ogden, now a judge of the superior court of Alameda County, for a review and modification of certain statements contained in the opinion of this court in the case of *Pekin Mining and Milling Company v. James Kennedy*, 81 Cal. 357, it is held that the statements in that opinion were based, of course, exclusively upon the findings made by the trial court, and were in no sense the result of an examination by this court, nor could they in any sense be construed as expressing the views of this court upon the matter; and that it is manifest that the exoneration of Judge Ogden upon the showing made in his petition is full and complete. This court also, from personal knowledge of Judge Ogden, joins in the expression of confidence embodied in the findings of the judges of the superior court of Alameda County; but, from the character and limits of the jurisdiction of this court, it is impossible for it to attempt to amend or correct the findings of the trial court, and so, impossible for it to afford the specific relief prayed for. The court orders the publication of its views in this matter, stating that it should suffice for the complete exoneration of the petitioner.

THE COURT.—In 1889 this court handed down a decision in the above-entitled case, which will be found reported in 81 Cal. 357, [22 Pac. 679]. In its opinion this court made reference to, and repeated the substance of, certain findings of the trial court, which findings reflected upon the fair dealing of Frank B. Ogden, petitioner herein. The gist of these findings

was that the said Ogden improperly and in fraud of the rights of James Kennedy and others, defendants, represented at an execution sale of certain mining claims of the Oro Fino Mining Company, that the Oro Fino Mining Company was not the owner of the property, and, after the sale, wrote his name in the constable's certificate of sale under execution. In the answer of Kennedy and others in the above-entitled suit no charge of fraud was made against Ogden, and there was no intimation that he was to be charged with fraud. Nothing in the answer tended to give notice that any such fraud was claimed. At the trial of the cause Ogden was called, testified, and went his way. Upon his examination neither his integrity nor the fairness of his acts was called in question. He never was informed during or after the trial of the cause that his testimony had been disputed, or his fair dealing questioned. He had no interest in the litigation, and the first knowledge that he acquired that the findings of the trial court in any way reflected upon him was from reading the reported decision of this court. Immediately upon becoming aware of this decision, the said Ogden himself presented the matter to the bar association of Alameda County, of which he was a member, with a request that an immediate investigation of his conduct be had. Such investigation was had and resulted in his complete exoneration, and the bar association of Alameda County addressed a letter, early in the year 1890, to the justices of this court, declaring that, after examination, the said Ogden, who at that time had become a judge in the county, was about to request a hearing before this court of the matters touching his integrity, and asked that such hearing be granted him. The judges of the superior court of Alameda County, expressing from their own knowledge the highest opinion of the character of Judge Ogden, united with the bar association in this request. The request which was urged upon this court personally by Judge Ogden, and also by a committee of the bar association of Alameda County, appointed for that purpose, was to the effect that this court should in some appropriate manner investigate the matter of the alleged fraud of Ogden, and report its conclusions thereon in some suitable way by footnote or appendix to the case of *Pekin Mining and Milling Co.* v. *Kennedy,* already reported. The justices of this court, each and all expressing willingness to do anything to sub-

serve the ends of justice, pointed out the impossibility of adding such footnote to the volume because it was already in print, and suggested, moreover, that as the judgment of this court in the case had been a judgment ordering a new trial it would be possible for Judge Ogden, upon such new trial, to have the facts thoroughly investigated, and a finding in accordance with those facts declared by the trial court. Judge Ogden then immediately communicated with Marcus P. Bennett, Esq., who had been the attorney for the plaintiff in the litigation, urging him to press the case for retrial, and offering to bear all the cost and expenses attending such trial, for the sole purpose, so far as he was concerned, of presenting to the court all of the evidence upon the question of his alleged fraudulent practice. Judge Bennett replied that a new trial was impracticable, as the hostile interests had been consolidated and the case had passed from his management and control, concluding his letter by offering his assistance to do whatever he could "to remove the blot from your good name, which I believe has been most unjustly attached to it."

Judge Ogden then requested Judge Bennett to confer with Judge Williams, who was the trial judge, and learn from him whether he would not be willing to take evidence and report upon this single matter, it being urged that he could do so without impairment of any of the rights under the decision, since his judgment had been reversed by the supreme court, and his finding of the fraudulent practice of Ogden was not within the issues of the case and in no way necessary to sustain the judgment. Judge Williams, in turn, could not see his way clear to try any portion of the case by piecemeal and declined to do so. Appeal was also made to George G. Blanchard, Esq., who had been the attorney for the defendants in the case, asking his aid that the matter might be thoroughly investigated and cleared up, and Mr. Blanchard wrote that he "exonerated Mr. Ogden from all imputation or wrong in the matter you refer to. . . . I am ready to do anything in my power to relieve Mr. Ogden in the matter you speak of. Judge Williams has gone out of office and of course can make no order in the case. Say to Mr. Ogden to prepare such a paper as will meet the facts of the case and it shall be done with as he may suggest."

Being thus unable to obtain relief from any quarter, Judge Ogden was constrained to give over his attempts, and in this situation the matter rested until 1893. In that year Judge Ogden's name was under consideration by Governor Markham for appointment to the position of judge of the superior court of Alameda County. Confronted by the case in the eighty-first volume of our reports, his Excellency appointed a commission, composed of the three judges of the superior court of Alameda County, to take evidence on the matter and report their findings to him. Such evidence was taken, and the following report and findings were made:—

"The transaction which bears most heavily against the said Ogden is found in the decision of the supreme court, expressed in this language:

" 'It had been agreed between Miller, Bargion and Kennedy that the latter should bid off the property in his own name. But it had also been agreed between Miller and Frank B. Ogden, that said Ogden should attend the sale for the purpose of procuring the title to said mine .to be taken in his (Ogden's) name. Ogden attended the sale, and it was agreed between him and Kennedy, that, for the purpose of deterring bidders, Ogden should give public notice at the sale that the mine did not belong to said Oro Fino Corporation, but was the property of him (Ogden). Such notice was accordingly given, and the mine was bid in by Kennedy, as before stated, but another complication arose. Ogden volunteered his assistance to the justice of the peace to write out the certificate of sale, and inserted therein his own name as purchaser, instead of that of Kennedy. This was not known to or discovered by the Constable (Cline) or Kennedy.'

"Upon these matters we make the following findings:—

"Said Ogden did attend the sale and give public notice that the mine did not belong to said Oro Fino Corporation, but was the property of him, Ogden.

"This notice was given in the belief, honestly entertained by said Ogden, that the title to said mine was in fact and in law in him, the said Ogden, under his deed from Schenck. This belief was at the time shared by Kennedy, Bargion and Miller. There was no attempt to defraud the judgment creditor, Phelps, or prevent his obtaining from the sale the full

amount of his judgment, and, in fact, the full amount of his judgment and costs was bid and the judgment creditor, Phelps, received all of the money from the sale of the property to which he was entitled under his judgment.

"It is true that Ogden volunteered his assistance to the justice to write out the certificate of sale, and inserted therein his own name as purchaser. It is not true that this was done without the knowledge of Kennedy or in fraud of Kennedy or Bargion, or in fraud of any person soever.

"We find that the said Ogden volunteered his services merely as penman. That he wrote his name in the certificate of sale because it was the understanding and agreement between Miller, Bargion and Kennedy that he should do so. And here we proceed to a brief analysis of the testimony before us on this point:—

"Manifestly there was no fraud and no impropriety in the said Ogden writing his name in said certificate, if in fact it was understood between Kennedy, Bargion and Miller, that the certificate should be issued in the name of Ogden as purchaser.

"Miller swears that it was the understanding between himself, Bargion and Kennedy, that the certificate should be taken in Ogden's name, and states the reasons therefor in his affidavit.

"Peter Bargion is now dead. His wife, however, makes affidavit to the high opinion which her husband always entertained of the character of the said Ogden, and her recollection that the certificate of purchase at the sale, under the Phelps judgment, should be taken in the name of Frank B. Ogden.

"The said Ogden testifies to like effect as Miller.

"In addition to this we have the evidence of Hon. Walter Van Dyke (now judge of the superior court of Los Angeles County, at that time attorney for said Miller), in the form of a letter addressed to said Ogden, bearing testimony to the honorable conduct and character of Ogden, and to the fact that the mine 'was sold under the Phelps claim, and was bid in by Ogden, Kennedy paying the money at the sale.' A payment understood, at the time, to be a payment on account of his indebtedness to Miller. Which evidence is strongly corroborative of that of Ogden and Miller.

"We have next the testimony of George G. Graham, likewise in a letter, to the effect that he was present at the sale, and drove Ogden and Kennedy to the mine. That at the sale Ogden stated, and the constable, Cline, announced, that the property was sold to Frank B. Ogden. That after the sale at the time Kennedy referred to the fact that the certificate was in the name of Frank B. Ogden.

"There is also the testimony of the justice of the peace, Tracy, taken upon the trial of the case, to the effect that Ogden wrote the certificate at his, the justice's, dictation, and that he, the justice, saw Ogden write his name in the certificate. And here it can scarcely be believed that if it was not by the justice at that time known to be the proper name therein to be inserted, he would have done as he testifies that he did, said nothing about it until a month or two thereafter.

"There is also the additional fact, undisputed by the evidence, that the said Ogden wrote the certificate in duplicate, each containing his own name, left them for the constable to sign, with instructions to the constable to file one for record, and it in fact was filed, and to deliver the other to Kennedy upon the payment by Kennedy of the money. One was actually filed for record and carried as matter of law, constructive notice to the world, of its contents, and the other was actually delivered to Kennedy long prior to July 1st, the date of his difference and trouble with said Miller. It is difficult to believe that any person would attempt the perpetration of so palpable a fraud, and one in its nature almost impossible to escape detection, and attempt the perpetration of such a fraud, the justice himself knowing that Ogden's name was written therein, the constable being called upon to sign them as his official act, one being placed of record, the other delivered to Kennedy himself, it is difficult, we say, to believe that under all these circumstances the fraud should have gone undetected, until nearly a month after the date of the beginning of the trouble between Kennedy and Miller.

"We are are of the opinion that the more rational view is that the charge of fraud was simply an afterthought of defendant Kennedy. In this we are sustained by the opinion of Hon. Marcus P. Bennett, then attorney for plaintiff, now

judge of the superior court of El Dorado County, who says in his letter above quoted, 'I contended for a very different finding, and argued the case on the theory of your entire innocence in taking the certificate in your own name, and supposed that the court would find in accordance with that theory, and was *mortified and surprised* that it did not.' Also the opinion of Hon. George C. Blanchard, found in his letter to A. A. Moore, above quoted, to the effect, that he exonerated Mr. Ogden from all *imputation of wrong* in the matter,' and that he had already willingly executed a declaration to that effect.

"As against all this testimony the charge of fraud has to be sustained, if sustained at all, upon the testimony of the single witness, Kennedy. And the proposition briefly stated is this: If Ogden wrote his name in the certificate of sale, without the knowledge and consent of Kennedy, he was guilty of a fraud. If he wrote his name in the certificate, with the knowledge and consent of Kennedy, he was entirely innocent of any fraud. Kennedy says this was done without his knowledge and consent. Giving to the testimony of Kennedy all the weight to which it is entitled, as the testimony of a single, credible witness, it is still greatly overweighed by all of the other testimony before us, which is entirely in favor of the account given by said Ogden.

"But is the testimony of Kennedy to be treated as the testimony of a credible witness? Assuredly not. No testimony impeaching Kennedy was before the trial court of El Dorado County, and little testimony in favor of Ogden was before the court; for, as has been hereinbefore set forth, it could not be determined by Ogden, and was in fact unknown to Ogden, that his integrity was to be questioned in that case. The answer of Kennedy, on file in the action, raises no such issue, and it was not to be supposed by Ogden or by the attorney for the plaintiff in that case, that his good name would be involved in the litigation. In illustration of this fact it may be noted that the Hon. Walter Van Dyke, who was familiar as an attorney and adviser, with all of the matters, testified in the case by deposition. He could and would doubtless then, as he does now, bear witness to the good faith of Ogden in all of the transactions.

But his deposition is silent upon the question. No interrogatories were put to him upon the subject of the certificate, because no one upon the plaintiff's side at that time knew that foul play would be charged in relation to the certificate.

"It is not for one moment to be supposed that had all of this evidence now before us been taken in the trial court, that the finding in question would have been made.

"In addition to that we have stated that Kennedy is not to be considered as a credible witness, and this is so because of the certified copies of papers now before us, and here marked as exhibits, it is proved that the said Kennedy had been convicted and sentenced in the state of New York for the crime of conspiracy committed as follows: 'The said Kennedy conspired with one Thomas and procured insurance upon the life of one Edward G. Burnham, a fictitious and non-existing person, in the sum of $10,000. Thereafter the said Kennedy procured a corpse, represented to the insurance companies that the corpse was the corpse of the said Burnham, caused the said corpse to be buried, and sought to collect the insurance. Also that the said Kennedy fled to the state of California, from the state of New York, to escape meeting four several indictments preferred against him by the grand jury of the city of Buffalo in 1883 (the transactions here under consideration took place in 1884), accusing said Kennedy of forgery and false pretenses as set forth in exhibit 6.'

"Also that the said Kennedy was at the time a lawyer, and was after due process disbarred by the supreme court of Erie County, New York, for his wicked, corrupt and felonious practices, and that his license to practice law was by said court canceled and revoked.

"Also that upon coming to this state the said Kennedy procured himself to be admitted to practice before the superior court of El Dorado County upon presentation of his said canceled certificate from the state of New York, and upon representation that the said certificate was in full force and effect, and upon testimony of his good moral character, furnished by the constable, Cline, who was a witness against said Ogden in the Pekin Mill & Mining Company suit.

"Thereafter the fact being made known to the judge of the superior court of El Dorado County, who was the same judge who tried the Pekin Mill & Mining Company's suit, and made the said finding against the said Ogden, supported largely, if not wholly, by the testimony of said Kennedy, the said Kennedy failing to appear before the court to explain his conduct in the premises was by the court ordered disbarred and forbidden to practice.

"As against this evidence of dishonesty of said Kennedy, there is before us abundant evidence of the highest kind and of the strongest nature in support of the character and reputation of said Ogden for truth, honesty and integrity; and, moreover, the judges of this court from long knowledge of and personal acquaintance with the said Ogden, are themselves, and each of them, able to bear witness, and do hereby bear witness, that the said Ogden during all his life has borne and now deservedly bears the highest reputation for truth, honesty and integrity, and is known and accredited in the community in which he resides as a man of the utmost rectitude in all the affairs of life.

"In conclusion, therefore, the judges of this court find that in none of the transactions mentioned or referred to in the Pekin Mill & Mining Company's suit, was the said Ogden guilty of any fraud; but, to the contrary, his conduct throughout was entirely free from fraud, and characterized by the best motives."

The foregoing findings from the record before us are abundantly substantiated. But notwithstanding this and the fact that the citizens of Alameda County have repeatedly expressed their conviction of Judge Ogden's integrity, by continuously and uninterruptedly electing him to the office of judge of the superior court, still the record of the case in the eighty-first volume of our reports stands, and unless corrected, will stand against him, his children, and his children's children, as a monument of infamy. For this reason, and upon this showing, he asks this court to afford him relief.

The statements in volume 81 of the California Reports were based, of course, exclusively upon the findings made by the trial court. They were in no sense the result of an examination by this court, nor could they in any sense be construed as

expressing the views of this court upon the matter. It is manifest that the exonerating of Judge Ogden upon the showing thus made is full and complete. This court also, from personal knowledge of Judge Ogden, joins in the expression of confidence embodied in the findings of the judges of the superior court of Alameda County. . But, from the character and limits of the jurisdiction of this court, it is impossible for it to attempt to amend or correct the findings of the trial court, and so, impossible for it to afford Judge Ogden this specific form of relief. However, the publication of the foregoing should suffice for his complete exoneration.

McFARLAND, J.

HENSHAW, J.

SHAW, J.

ANGELLOTTI, J.

LORIGAN, J.